# Illinois Official Reports

## Appellate Court

*People v. Urzua*, 2021 IL App (2d) 200231

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERNESTO URZUA, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0231 |
| Filed | September 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 06-CF-2221; the Hon. Marmarie J. Kostelny, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and David Holland, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Presiding Justice Bridges and Justice Brennan concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant appeals from the second-stage dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). His sole contention on appeal is that he did not receive reasonable assistance from postconviction counsel, whom he retained after his appointed attorney withdrew after purporting to comply with *People v. Greer*, 212 Ill. 2d 192 (2004), and Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). We reverse and remand for further second-stage proceedings with the appointment of new counsel and compliance with Rule 651(c).

¶ 2                                    I. BACKGROUND
¶ 3                 A. The Charges, Pretrial Proceedings, and Trial Evidence
¶ 4    Around 5 p.m. on March 1, 2002, the victim, Gerardo Contreras, was shot four times in his back and arm as he retrieved the mail from his mailbox in the front yard of his house, which was next to the parking lot of a church, on Columbia Street in Aurora. At the time, he was with his two-year-old daughter, whom Contreras shielded from injury. The injuries Contreras sustained were life threatening and left him paralyzed "from the mid-chest area down." Contreras spent approximately two months under daily care, first at Loyola University Medical Center in Maywood and then at the Rehabilitation Institute of Chicago. The case went unsolved for more than four years, and ultimately, Horatio "H" Morales and Jamaal "Ike" Garcia told investigators that defendant shot Contreras, which led to defendant being charged by indictment with attempted murder (720 ILCS 5/8-4(a), 9-1(a) (West 2002)) in relation to the shooting. The indictment also alleged defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability, or permanent disfigurement to Contreras, which meant defendant was subject to a 25-year sentence enhancement if found guilty of attempted murder. See *id.* § 8-4(c)(1)(D).

¶ 5    Trial commenced on January 7, 2008. That day, the State moved *in limine* to bar defendant from eliciting evidence of Contreras's prior adjudication as a delinquent minor and conviction of felony offenses. The trial court granted the motion.

¶ 6    The State's theory of the case was that defendant, a member of the Latin Kings street gang, shot Conteras under an order from Andres "Oso" Ramirez, who was the leader of the Latin Kings in Aurora, and that the shooting was motivated by (1) a rivalry between the Latin Kings street gang and the Ambrose and Insane Deuces street gangs, with which Contreras was affiliated, and (2) Contreras's purported disrespect toward the Latin Kings. During opening statements, the State told the jury it expected the evidence to establish defendant "committed [this] horrendous, cowardly crime."

¶ 7    Other than Contreras's daughter, whose testimony the State did not present at trial, and Contreras himself, there were no eyewitnesses to the shooting, and no physical evidence directly connected defendant to the crime. However, the State presented the testimony of three of Contreras's neighbors, all of whom heard five or six gunshots. Two of those neighbors, Jose Acevedo Jr. and Jose Caballero, looked out their windows and saw a man, who was wearing dark clothing, including a black hooded sweatshirt, running south through the parking lot of the church, toward Claim Street. The third neighbor, JoAnn Howard, heard the gunshots but

did not look out her window. Rather, she called the police and, while on the phone, heard a man yelling, "help me, I've been shot."

¶ 8     At the time, Contreras's house was located in a neighborhood "belong[ing] to" the Latin Kings. The Latin Kings were known to enforce with violence the boundaries of their neighborhood. At the time of the shooting, Contreras "affiliate[d] with" members of the Ambrose and Insane Deuces street gangs, which were friendly with each other but rivals of the Latin Kings. The Latin Kings congregated at a "nation house" on Claim Street, which was the next street south of Columbia Street. On some date before the shooting, Contreras and Ramirez flashed gang signs at each other.

¶ 9     Shortly after he was shot, Contreras told a responding police officer a man shot him and then ran toward Claim Street through the church parking lot. Though asked, Contreras could not provide a description. On March 13, 2002, while in the hospital, Contreras spoke to investigator Robert Wallers and described the shooter as an 18- to 21-year-old Hispanic man, who had a light complexion, was five feet and seven or eight inches tall, and weighed 145 to 150 pounds. Contreras also told Wallers the man was wearing a black crewneck sweatshirt, black pants, and a black beanie with an "English style" letter "D" on it. Contreras told Wallers the man used a silver or chrome handgun. Wallers had Contreras look through a "gang affiliate book," which contained photographs of known gang affiliates, in hopes of identifying the shooter. Contreras could not do so.

¶ 10    Using the description Contreras gave him, Wallers compiled a photographic array, which included defendant's photograph, and, on April 5, 2002, showed it to Contreras. Contreras did not identify anyone in the photographs as his shooter. The investigation stalled and, on May 6, 2002, was administratively closed pending further leads or developments.

¶ 11    Approximately four years later, in February 2006, after receiving information about the shooting from a special agent with the Federal Bureau of Investigation (FBI), Detectives Michael Nilles and Jeff Sherwood of the Aurora Police Department spoke to Morales, who was in the custody of the Illinois Department of Corrections, about the shooting. In May 2007, Garcia also came forward and spoke to police about the shooting.

¶ 12    At trial, Morales testified that he was currently serving 10- and 3-year sentences for his 2005 armed robbery and unlawful use of a weapon by a felon convictions, respectively. He also acknowledged he had illegally reentered the country after having been previously deported, which he knew was a federal crime. He also knew that, at the conclusion of his state sentence, he could be prosecuted for that crime, the penalty for which was "possibly" 10 years in federal prison. However, at the time of trial, Morales had not been told, nor had anyone even indicated, he would not be prosecuted or deported as a result of his testimony against defendant.

¶ 13    On March 1, 2002, Morales, an associate of the Latin Kings, had recently been released from prison. He lived at the "nation house" with defendant, whom he knew only by his nickname "Limon," and Garcia, both of whom were members of the Latin Kings. According to Morales, Garcia had a "darker" complexion than him. In the short time Morales lived with defendant and Garcia, Morales twice heard them talking about the fact Contreras, a rival gang member, lived in the Latin Kings' neighborhood.

¶ 14    On the day of the shooting, Morales was drinking alcohol and smoking marijuana. He did not know whether someone was "pulling security" at the time. At some point, Ramirez, Michael Reyes, and Paul Benevides, all members of the Latin Kings, came to the nation house.

Five or six minutes later, Morales heard Ramirez tell defendant to "go get" Contreras and saw Benevides give defendant what looked like a chrome revolver. Defendant then put on a black hooded sweatshirt, left the nation house, and ran through the church parking lot toward Columbia Street. Morales watched through the front window of the nation house and lost sight of defendant as he made a left turn. Morales then heard five or six gunshots and saw defendant running back toward the nation house. When defendant got back inside, he took off his sweatshirt and gave the gun to Garcia, who then ran downstairs and put the gun away. Everyone then left the house.

¶ 15    The next day, Morales saw defendant, who was with self-admitted Latin King Orlando Delgado, carrying from the basement of the nation house a gun-shaped object wrapped in a newspaper. Defendant left with Delgado and then went to Mexico for two or three months.

¶ 16    Morales did not report what he saw to the police in 2002, 2003, or 2004, but while in the Kane County jail in 2005, Morales decided to "turn [his] life around." Accordingly, on February 16, 2006, Morales spoke with Detectives Nilles and Sherwood. At the time, the detectives told Morales they believed defendant was the shooter. Morales identified defendant in a photographic array as the person who shot Contreras. At that time, he requested that his brother, who was also in custody, be transferred to the same prison he was in, because he was concerned for his brother's safety, as the Latin Kings had already made threats against him and his family. At the time of trial, Morales's brother was housed in the same facility as Morales. Thereafter, Morales began writing letters to Nilles, whom he considered a friend.

¶ 17    Morales also testified that Garcia was inside the nation house when the shooting occurred. He did not recall if Garcia was "pulling security" that day and did not recall him leaving the house with Damon "Malo" Jones to buy cigarettes before the shooting. After the shooting, Garcia took the gun into the basement to hide it and then left the house. On February 16, 2006, the detectives showed Morales "a number of newspapers" and then showed him two photographic arrays. Morales identified defendant as the man who shot Contreras and Ramirez as the person who gave defendant an order to shoot Contreras.

¶ 18    Detective Nilles testified that, after he spoke with Morales, Morales began writing him personally and, on some occasions, asked for favors, such as having his brother transferred to the same correctional facility in which he was housed and having the Aurora Police Department or the FBI protect his family. Nilles could not recall, however, having any conversation with Morales regarding his immigration status or possible prosecution for illegally reentering the country.

¶ 19    Garcia testified he had prior juvenile adjudications of delinquency for the offenses of armed violence and mob action in 2000 and felony convictions of unlawful possession of a controlled substance in 2000, unlawful use of weapon by a felon in 2003, and burglary in 2005. At the time of trial, he was in prison as a result of one of his prior convictions.

¶ 20    Garcia was released from prison a month or two before the shooting and lived in the nation house. He lived with Morales, who had been released from prison at most two weeks before the shooting, and defendant. In the months Garcia lived at the house, "a topic of conversation" was that Contreras, an apparent member of the Insane Deuces, was living in Latin Kings territory.

¶ 21    Around 4:30 p.m. on March 1, 2002, Garcia, Morales, Jones, defendant, and a "couple other people" were at the nation house. At some point in the day, Garcia took possession of

the "nation gun," which was a revolver any Latin King could use, because he was acting as "security."

¶ 22     Around 4:30 p.m., Garcia left the nation house with Jones to purchase cigarettes. He left the gun on a foot stool near the front door. When he returned home a couple minutes later, the gun was not where he had left it. Garcia assumed another Latin King grabbed it when he left for the store, which was not unusual. Garcia stayed on the front porch and, a couple minutes later, saw Contreras arrive at his home. Defendant, who was wearing a dark-colored hooded sweatshirt, "took off" alone toward Contreras's house, running through the church parking lot. Garcia lost sight of defendant as he reached the front of Contreras's house.

¶ 23     Garcia heard gunshots and saw defendant run back through the parking lot to the "nation house." He did not actually see the shooting. Garcia and defendant went into the basement, "cleaned" the gun, and stashed it "in the wall." After stashing the gun, everyone who was at the nation house fled. Garcia never returned to the house because, that night, he was arrested on an outstanding warrant in a different case.

¶ 24                    B. The Verdict and Defendant's Posttrial Motion

¶ 25     The jury found defendant guilty of attempted murder and also found the State proved the allegation that, in committing the offense, defendant personally discharged a firearm that proximately caused great bodily harm, permanent disability, or permanent disfigurement to another person. Defendant moved for a new trial. He raised no argument concerning the court's order *in limine* barring him from introducing evidence of Contreras's prior convictions or the State's use of the term "cowardly" in its opening statement. The court denied the motion.

¶ 26                                    C. Sentencing

¶ 27     The presentence investigation report (PSI) showed defendant was born August 30, 1982, making him 19 years old at the time of the offense. The PSI also showed that, between 1999 and 2007, defendant had accrued a lengthy criminal history, including 4 felony convictions (2 of which involved the possession of a firearm), 4 misdemeanor convictions, and 12 traffic and ordinance violations. Defendant was on mandatory supervised release (MSR) when Contreras was shot.

¶ 28     At sentencing, the State argued none of the statutory mitigating factors applied to defendant. In regard to the evidence showing defendant acted at the behest of Ramirez, the leader of his gang, the State argued that was "not the type of facilitation or inducement that was contemplated by the statute." See 730 ILCS 5/5-5-3.1 (West 2002). The State asked the court to sentence defendant to "no less than 20 years" on top of the 25-year firearm enhancement. Defendant's attorney made no mention of defendant's relative youth at the time of the offense, offered no response to the State's argument regarding the fact defendant apparently acted at the behest of Ramirez, and made no mention of any of the statutory mitigating factors. Instead, he argued, primarily, that the 25-year firearm enhancement was unconstitutional. Defendant did not make a statement in allocution.

¶ 29     The court sentenced defendant to 23 years, plus the 25-year firearm enhancement, for an aggregate sentence of 48 years. In reaching its sentence, the court noted no statutory mitigating factors applied, defendant's "serious criminal history" was an aggravating factor, and the sentence was necessary to deter others from committing serious crimes. Additionally, it noted

defendant was on MSR at the time of the offense and the offense was related to the activities of an organized gang. Finally, the court emphasized the nature and circumstances and seriousness of the crime, noting Contreras was shot in his back while carrying his daughter in the front yard of his own home and while unarmed. The court did not mention defendant's age or rehabilitative potential.

¶ 30     Defendant moved to reconsider his sentence, contending, in part, "the [c]ourt failed to follow Article I, Section 2 of the Illinois Constitution, which states as follows: 'All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " At the hearing on the motion, defendant made no argument as to his claim the court did not adequately balance the seriousness of the offense and the objective of restoring him to useful citizenship. The court denied the motion.

¶ 31                                   D. Direct Appeal

¶ 32     On direct appeal, defendant challenged only the sufficiency of the State's evidence. We rejected his contention and affirmed. *People v. Urzua*, No. 2-08-0237 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 33                          E. Postconviction Proceedings

¶ 34     In July 2010, defendant *pro se* petitioned for relief under the Act, asserting claims of ineffective assistance of counsel, a challenge to his sentence under the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), and a claim of actual innocence based on newly discovered evidence. Specifically, his ineffective-assistance claims alleged his trial attorney was constitutionally deficient because the attorney failed to "object [to] and preserve for the record" (1) the circuit court's refusal to allow Contreras's prior convictions into evidence for impeachment purposes and (2) the prosecutor's characterization of defendant as a "coward" in its opening statement, which inflamed the passions of the jury and prejudiced him from the outset. The petition generally asserted appellate counsel was also ineffective, without explaining why or how.

¶ 35     As to his proportionate-penalties claim, defendant asserted his aggregate 48-year sentence was " 'cruel and degrading' " and did not comply with the proportionate-penalties clause because it failed to take into account his rehabilitative potential. His sole support for the claim was that he was "25 years old when charged and convicted."

¶ 36     As to his actual-innocence claim, defendant attached the "affidavit" of Markus Spires, who averred that, in March 2002 (though he did not remember the actual date), he was driving on Claim Street when he "came upon" his friend, Garcia, who was wearing a black hooded sweatshirt and was "running really fast as if he were trying to get away from someone/something/or somewhere, from the direction of Columbia [Street]." Spires further averred that he pulled over and Garcia entered his car. As Garcia entered his car, he saw Garcia was carrying a chrome revolver. Spires asked Garcia "what was *** going on," and Garcia told him he had just shot an " 'Insane Deuce' over on Columbia [S]treet." Further, Spires averred, "I for some reason didn't think to have [Garcia] get out while he still brandished the gun or to know anything further for I truly did not want any part of the trouble that was sure to follow." Spires drove Garcia a few blocks, at which time Garcia threw the revolver from the window and then asked to be let out of Spires's car. Spires averred that he was giving the statement of his own free will, free from influence from threats or promises, and because it

was "the right thing to do after learning [defendant] was charged" for the shooting. The "affidavit" was not notarized; rather, it was signed by Spires, on April 4, 2010, "under the penalty of perjury" pursuant to section 1-109 of the Code of Civil Procedure (Code) (735 ILCS 5/1-109 (West 2010)). Defendant asserted he was entitled to a new trial because the "affidavit" was new, material, noncumulative, and of such conclusive character it would likely change the result on retrial.

¶ 37    The circuit court did not rule on the petition within 90 days. On December 22, 2010, the court advanced the petition to second-stage proceedings under the Act and, on May 6, 2011, appointed the public defender to represent defendant. Due to a conflict of interest within the public defender's office, private attorney Ronald Haskell was appointed to represent defendant. After several delays in receiving the transcripts, on August 12, 2015, Haskell told the court he had reviewed the transcripts and was now in the position to file an amended petition within the next 30 days. At subsequent status hearings, Haskell told the court he still "need[ed] to contact an individual" he had been unable to find and needed his investigator "to check a couple things out."

¶ 38    Haskell did not file an amended petition; rather, on August 10, 2016, he moved to withdraw under the procedures set forth in *Greer* and *People v. Kuehner*, 2015 IL 117695. Haskell also filed a supporting memorandum, asserting he could not ethically proceed with defendant's petition. In relevant part, as to defendant's actual-innocence claim, Haskell noted the lack of notarization on Spires's affidavit was "at best problematic" but argued it arguably satisfied the requirements that the evidence was new, material, and noncumulative. Haskell asserted, however, the affidavit was not of such conclusive character as to probably change the result on retrial, because it appeared to have been executed on the same typewriter as defendant's *pro se* petition and was not notarized for authentication. Further, he argued he had not been provided any information that would allow him to confirm the existence of Spires, such as his current location, the nature of his relationship with defendant, and his criminal history or gang affiliation, if any. Finally, he contended, "the information provided by Spires that would have shifted the blame *** to Jamal [*sic*] Garcia [wa]s contradicted by multiple witnesses' description of a light skinned shooter *** where[as] *** Garcia, who is now deceased, was a dark skinned individual."

¶ 39    Haskell also certified under Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) that he had (1) reviewed the common-law record and report of proceedings submitted to this court in defendant's direct appeal, the PSI, defendant's briefs, and our disposition in his direct appeal; (2) consulted with defendant, both in writing and in person, in a manner "sufficient to fully understand [defendant's] issues and intent"; (3) read defendant's *pro se* petition; and (4) determined the *pro se* petition raised no issues of merit.

¶ 40    On February 27, 2017, Haskell told the court he intended to proceed on his motion. The court confirmed the State had not yet moved to dismiss the petition and asked defendant if he would like to respond to Haskell's motion. Defendant told the court his family was going to help him hire a private attorney and needed an additional six or seven months to do so. The court allowed Haskell to withdraw and also granted defendant leave to seek new representation. Though the State objected to the length of time defendant requested to find a new attorney, it did not object to the court granting defendant leave to do so.

¶ 41    On March 7, 2017, however, the State moved to reconsider the court's ruling granting defendant an extension of time to obtain new counsel. In its motion, the State cited *People v.*

*Thomas*, 2013 IL App (2d) 120646, in support of the proposition that, as long as a proper *Greer* motion and Rule 651(c) certificate had been filed, a defendant is not entitled to receive the services of another attorney, either appointed or retained, to second-guess the professional judgment of the attorney who withdrew. On March 21, 2017, the State moved to dismiss defendant's petition.

¶ 42    At the hearing on the State's motion to reconsider, the court asked defendant for his position. He told the court his family had been seeking an attorney to take over his representation and he felt Haskell had not properly represented him, because Haskell "never [sought] witnesses [or anything else] that [defendant] was telling [him] to seek." According to defendant, when Haskell told defendant of his plan to withdraw, defendant told Haskell "it would be in his best interest [to do so] because [he was] looking to hire a paid attorney."

¶ 43    The court denied the State's motion to reconsider, reasoning that it had not "jump[ed] as far" as the State believed it had. The court noted that, at the time it granted Haskell leave to withdraw, the State had not yet filed a responsive pleading. Accordingly, the court concluded, while it could not *appoint* another attorney to represent defendant, defendant was entitled to hire his own counsel to respond to the State's motion to dismiss or seek leave to file an amended petition, at which point the State could object. However, the court noted that, because the State had now filed a motion to dismiss, it had to move the proceedings forward, and therefore, it continued the motion to June 8, 2017, for a hearing on the motion. The court told defendant that, if he did not retain an attorney by that date, he would have to argue the motion himself.

¶ 44    On June 8, 2017, the law firm of McNamee & Mahoney, Ltd., entered its appearance on behalf of defendant. On January 23, 2018, after several continuances granted without objection from the State, attorney Timothy Mahoney told the court attorney Matthew Haiduk was also going to represent defendant, and he requested 60 days in which to amend defendant's *pro se* petition. The court granted the request without objection from the State.

¶ 45    At a status hearing on April 3, 2018, Mahoney told the court he and Haiduk had "discovered some new issues that caused [them] a little bit of concern." At subsequent status hearings, Mahoney told the court that, while "it doesn't look like there's much going on[,] there really is a lot going on" and that Mahoney had been making "some efforts *** to work this out through the authorities as [defendant had] provided some information several years ago."

¶ 46    At the final status date, on October 8, 2019, Haiduk told the court he had "done a pretty lengthy investigation" but would not be able to amend the petition. Accordingly, Haiduk and Mahoney elected to adopt defendant's *pro se* petition. The court set the State's motion to dismiss for a hearing.

¶ 47    Before the hearing on the State's motion, Haiduk certified under Rule 651(c) that he had "consulted with [defendant] by phone on November 15, 2019[,] to ascertaine [*sic*] his or her contentions of deprivations of constitutional rights, ha[d] examined the record of proceedings at the trial, and ha[d] made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."

¶ 48    At the hearing on the State's motion to dismiss, the State reiterated the position set forth in its March 2017 motion to reconsider, *i.e.*, that, under *Thomas*, defendant was not entitled to new counsel once his original appointed attorney was granted leave to withdraw under *Greer*. With respect to defendant's actual-innocence claim, the State argued the claim could be dismissed for the sole reason that Spires's affidavit was not notarized. The State also noted

Spires's affidavit contained no information from which the court could determine the evidence was new and could not have been obtained before trial. Finally, the State argued Spires's affidavit contained inadmissible hearsay and that Garcia, who allegedly confessed to Spires, was now dead. The State also specifically adopted the contentions made by Haskell in his motion to withdraw.

¶ 49 With respect to the actual-innocence claim, Haiduk argued Garcia's statements to Spires were admissible as a statement against Garcia's penal interest. See Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011). As to the existence of Spires, Haiduk stated he had "put 30 seconds in looking for [him]" and tendered to the court a computer printout (which the court did not admit into evidence) showing a man named "Markus Spires," who was about the same age as defendant and the witnesses in this case, was arrested and charged in Cook County in 2016 for an unidentified offense. As to the lack of notarization on Spires's "affidavit," Haiduk argued defendant was not required under the Act to have the "affidavit" notarized, as it was signed under penalty of perjury. According to Haiduk, whether Spires existed and whether he would testify consistently with his "affidavit" were factual questions to be resolved at a stage-three evidentiary hearing.

¶ 50 On February 28, 2020, the court entered a written order granting the State's motion to dismiss defendant's *pro se* petition. In relevant part, the court found the lack of notarization on Spires's "affidavit" was fatal to defendant's actual-innocence claim and, despite the fact the State had placed defendant on notice of the defect, defendant never attempted or was unable to correct it.

¶ 51 This appeal followed.

¶ 52                                             II. ANALYSIS

¶ 53 On appeal, defendant contends Haiduk and Mahoney, his retained attorneys, did not provide reasonable assistance as guaranteed by the Act and Rule 651(c). Specifically, he argues that, despite Haiduk's certification that he complied with Rule 651(c), his retained attorneys failed to (1) make certain routine amendments to his petition to avoid procedural obstacles, (2) properly present his actual-innocence claim, and (3) review pertinent transcripts, such as that of the sentencing hearing. He maintains his attorneys' unreasonable assistance requires remand without regard to the underlying merits of his petition and asks that we remand the matter for further second-stage proceedings with new appointed counsel.

¶ 54 The State does not specifically respond to the merits of defendant's contentions or raise any argument as to defendant's suggested remedy. Rather, the State argues the circuit court's order granting defendant's original appointed postconviction attorney leave to withdraw under *People v. Greer*, 212 Ill. 2d 92 (2004), extinguished defendant's right to counsel under the Act. As a result, the State asserts, defendant's free-standing claim of unreasonable assistance is not legally cognizable and must be rejected. In other words, once defendant's appointed attorney was granted leave to withdraw, defendant had no right to the assistance of *any* counsel and, therefore, no right to reasonable assistance of counsel. In support of its argument, the State relies primarily on *Greer* and *Thomas*. Thus, the State raises a threshold issue: whether a defendant is entitled to reasonable assistance of counsel if he or she retains an attorney to further press postconviction contentions after his or her original appointed postconviction attorney is allowed to withdraw after complying with *Greer* and Rule 651(c).

¶ 55 Because this appeal arises from a second-stage dismissal under the Act, our review is *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). To the extent the case requires us to interpret the Act and Rule 651(c) and determine whether defendant's retained attorneys complied with Rule 651(c), our review is also *de novo*. *People v. Tousignant*, 2014 IL 115329, ¶ 8; *People v. Profit*, 2012 IL App (1st) 101307, ¶ 17.

¶ 56                          A. Was Defendant Entitled to Reasonable Assistance?
¶ 57                                         1. *The Act*
¶ 58 The Act sets forth a procedure under which an incarcerated defendant can assert his or her conviction was the result of a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act contemplates a three-stage proceeding, which is initiated by the filing of a petition. *Id.* The defendant must verify the petition by affidavit (725 ILCS 5/122-1(b) (West 2010)); the petition must "clearly set forth the respects in which [his or her] constitutional rights were violated" (*id.* § 122-2); and the petition must have attached thereto affidavits, records, or other evidence supporting its allegations or state why the same are not attached (*id.*).

¶ 59 At the first stage of proceedings, the circuit court must, within 90 days of the petition's filing, independently evaluate the petition, and if the court determines it is frivolous and patently without merit, it must dismiss the petition in a written order. *Id.* § 122-2.1(a)(2). Accordingly, the petition advances to the second stage if (1) the court fails to rule on the petition within the 90-day period, regardless of the petition's merit (*People v. Harris*, 224 Ill. 2d 115, 129 (2007)), or (2) the facts alleged in the petition state an arguable claim of constitutional deprivation (*Hodges*, 234 Ill. 2d at 9, 17).

¶ 60 At the second stage, the court shall appoint counsel for an indigent defendant upon his or her request. 725 ILCS 5/122-4 (West 2010). The State may answer the petition or move to dismiss it. *Id.* § 122-5. The Act gives the court broad discretion, at any time before final judgment, to allow amendments to the pleadings and extensions of time "as shall be appropriate, just[,] and reasonable and as is generally provided in civil cases." *Id.* The question at the second stage of proceedings is whether the allegations of the petition, taken as true unless positively rebutted by the record, and the attached supporting materials make a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶¶ 33, 35. In deciding this question, the court does not make credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). If the petition makes such a showing, it advances to a third-stage evidentiary hearing. *Id.*

¶ 61                          2. *The Statutory Right to Assistance of Counsel*
¶ 62 It is well established there is no *constitutional* right to counsel in proceedings under the Act. *People v. Owens*, 139 Ill. 2d 351, 364-65 (1990). Rather, the right to counsel is derived solely from the Act, and, therefore, "defendants are guaranteed only the level of assistance provided for by the Act." *People v. Johnson*, 2018 IL 122227, ¶ 16 (*Granville Johnson*). A defendant who is represented by counsel in proceedings under the Act is entitled to "a 'reasonable' level of attorney assistance." *Id.* This is true whether the attorney is appointed or retained and whether the matter is at the first, second, or third stage of the proceedings. *Id.* ¶¶ 16, 18.

¶ 63    Rule 651(c) limits the duties an attorney must undertake at the second stage of proceedings. It requires counsel "only to certify that they have 'consulted with the petitioner by phone, mail, electronic means[,] or in person,' 'examined the record' as needed to shape the defendant's *pro se* claims, and 'made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation' of those claims.' " *People v. Custer*, 2019 IL 123339, ¶ 32 (quoting Ill. S. Ct. R. 651(c) (eff. July 1, 2017)). Counsel's certification that he or she complied with those duties creates a rebuttable presumption that counsel provided the defendant a reasonable level of assistance, absent an affirmative showing in the record otherwise. *Id.* ¶¶ 32, 38. The requirements of Rule 651 "do not include bolstering every claim presented in a petitioner's *pro se* postconviction petition, regardless of its legal merit, or presenting each and every witness or shred of evidence the petitioner believes could potentially support his position." *Id.* ¶ 38.

¶ 64                          3. *Greer* and *Thomas*

¶ 65    As noted, the State relies primarily on *Thomas* in support of its argument that defendant was not entitled to any assistance, let alone reasonable assistance, from his retained attorneys. However, because it informs much of the basis for the *Thomas* court's holding, we first examine *Greer*.

¶ 66    In *Greer*, the circuit court advanced the defendant's *pro se* petition to the second stage and appointed him counsel after it failed to rule on the petition within 90 days. *Greer*, 212 Ill. 2d at 200. The appointed attorney ultimately moved to withdraw, stating he had reviewed the record, transcripts of the proceedings, and the state's attorney's files and had interviewed "all relevant parties," including the defendant, and determined "he could find no basis on which to present any meritorious issue for review." (Internal quotation marks omitted.) *Id.* With his motion, the appointed attorney submitted a brief purporting to comply with *Anders v. California*, 386 U.S. 738 (1967), in which the attorney concluded he could not " 'properly substantiate' " the defendant's claims and had considered other potential claims and determined they lacked merit. *Greer*, 212 Ill. 2d at 200. Before the State had answered the petition or moved to dismiss it, the circuit court granted the appointed attorney's motion and dismissed the petition, finding it presented no constitutional claims of merit. The defendant appealed, arguing the court should not have permitted his appointed attorney to withdraw and should not have dismissed his petition *sua sponte* after granting his attorney's motion. The appellate court affirmed the portion of the circuit court's order granting the attorney leave to withdraw but reversed the portion dismissing the petition, finding the dismissal was premature. *Id.* at 195.

¶ 67    The supreme court affirmed the appellate court, holding an attorney appointed to represent a defendant in proceedings under the Act has an *ethical obligation* to withdraw when the attorney determines the defendant's claims are meritless. *Id.* at 209. In doing so, the court observed that an attorney cannot advance frivolous or spurious claims on behalf of a client, because doing so violates his or her duties under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). *Greer*, 212 Ill. 2d at 205. With respect to postconviction counsel's duty to make any necessary amendments to adequately present a defendant's claims, the court found amendments that would only further frivolous or patently unmeritorious claims are not " 'necessary' " within the meaning of the rule. *Id.* The court also rejected the defendant's

argument that his appointed attorney could not withdraw because the Act did not specifically authorize it, reasoning, in part, as follows:

"[T]he legislature has seen fit to confer upon the circuit court the power, without the necessity of appointing counsel, to dismiss, outright, petitions at first stage when they are deemed frivolous or patently without merit. The fact that the legislature has required appointment of counsel for indigent defendants when the circuit court has not considered a postconviction petition in a timely manner does *not*, in our opinion, indicate that the legislature intended that such a defendant have *continuing representation* throughout the remainder of postconviction proceedings, where counsel later determines that the petition is frivolous or clearly without merit. The purpose behind appointment of counsel in the latter instance might be, and probably is, nothing more than a desire to jump-start a process that has shown no signs of progress. There appears to be no other rationale for treating similarly situated defendants differently. Each defendant has filed a frivolous petition. The legislature surely did not intend to accord the latter defendant continuing representation after counsel determines the petition to be frivolous when the former defendant is never given counsel in the first place." (Emphases in original and added.) *Id.* at 208-09.

¶ 68    In *Thomas*, the defendant's *pro se* petition was advanced to the second stage, and the defendant was appointed counsel by reason of the circuit court's failure to take action within the initial 90-day period. *Thomas*, 2013 IL App (2d) 120646, ¶ 2. More than four years later, the appointed attorney certified she had consulted with the defendant and reviewed the record of proceedings, and she subsequently moved to withdraw under *Greer*. *Id.* ¶¶ 2-3. The circuit court granted the attorney's motion and denied the defendant's *pro se* petition before the State had answered or moved to dismiss it. *Id.* ¶ 3. The defendant appealed, and we reversed on the basis that the circuit court erred by denying the petition before the State answered or moved to dismiss it. *Id.* We did not consider whether the circuit court had erred in permitting the defendant's attorney to withdraw. *Id.* ¶ 4. On remand, the circuit court reappointed the attorney who had withdrawn and then later appointed a different attorney to replace her. *Id.* The new attorney did not comply with Rule 651(c) and instead moved to withdraw on the basis that the previous attorney had been permitted to withdraw under *Greer*, arguing the defendant had no right to " 'successive court-appointed counsel.' " *Id.* The circuit court allowed the attorney to withdraw and dismissed the defendant's petition. *Id.*

¶ 69    On appeal, the defendant argued the second-stage dismissal of his postconviction petition should be reversed because he did not receive reasonable assistance from the attorney appointed on remand, as the record did not show the attorney complied with Rule 651(c). *Id.* ¶¶ 6-7. We rejected defendant's contention, concluding defendant's right to reasonable assistance had been extinguished when his original postconviction attorney withdrew in conformity with *Greer*. *Id.* ¶ 9. We interpreted the words "continuing representation," used by the *Greer* court, to mean "representation by *any* appointed attorney (as opposed to representation by the particular attorney seeking to withdraw)." (Emphasis in original.) *Id.* ¶ 7. We explained that to conclude otherwise would lead to the disparate treatment the *Greer* court denounced and, further, to appoint counsel in such a situation "would ordinarily be an empty gesture, inasmuch as successor counsel would be obliged to withdraw for precisely the same reasons that led his or her predecessor to withdraw." *Id.* Accordingly, we concluded, "once an attorney appointed to represent a defendant in a postconviction proceeding has withdrawn in

- 12 -

conformity with the requirements of *Greer*, there will be no further *statutory* right to counsel, at least in the absence of unusual circumstances." (Emphasis added.) *Id.* We further found that, because the defendant had no right to an attorney, the circuit court's appointment of counsel on remand "was [not] truly under the auspices of the Act" and, therefore, the defendant "was not entitled to the level of assistance guaranteed when the Act actually provides a right to counsel." *Id.* ¶ 9.

¶ 70                                4. *This Case*

¶ 71    As noted, the State argues, under *Thomas*, once Haskell certified under Rule 651(c) that he had complied with the rule and was allowed to withdraw, defendant no longer had a statutory right to counsel and, therefore, no right to reasonable assistance from *any* attorney, let alone his retained attorneys. We are not persuaded, and under the circumstances present here, we conclude defendant was entitled to reasonable assistance from his retained attorneys.

¶ 72    *Thomas* is inapposite. It involved a scenario in which the circuit court *appointed* new counsel to the defendant, on remand, after his original postconviction attorney withdrew, thus granting the defendant his statutory right to counsel twice, an action not contemplated by the Act. We note neither the Act nor *Thomas* considers the effect of withdrawal by original appointed postconviction counsel on a defendant's right to reasonable assistance from, as is the case here, a subsequently retained private attorney. More importantly, the circuit court in *Thomas* granted the defendant's original postconviction attorney leave to withdraw based on the attorney's conclusion that, under *Greer*, the defendant's claims were unmeritorious. In fact, the circuit court in *Thomas* went even further, dismissing the petition before the State had answered or moved to dismiss it. But in this case, there is no indication the court granted Haskell leave to withdraw on the basis that he determined the claims lacked merit as opposed to defendant's desire, and stated intent, to retain a different attorney. Indeed, the record compels the opposite conclusion.

¶ 73    At the hearing on Haskell's motion to withdraw, defendant told the circuit court his family intended to hire an attorney to press his postconviction claims. In granting Haskell's motion, the court made no mention of the merits of defendant's *pro se* petition. At the hearing on the State's motion to reconsider the order allowing defendant time to hire a new attorney, defendant told the court his family had been seeking an attorney; he felt Haskell had not properly represented him because Haskell "never [sought] witnesses [or anything else] that [defendant] was telling [Haskell] to seek"; and, when Haskell told defendant he intended to withdraw, defendant told Haskell "it would be in [Haskell's] best interest [to do so] because [defendant was] looking to hire a paid attorney." And in denying the State's motion, the court specifically stated it had not considered the merits of defendant's petition when it allowed Haskell to withdraw. Under these circumstances, it is clear the court allowed Haskell to withdraw because defendant intended to hire a new attorney, not because of Haskell's determination that defendant's claims lacked merit. Accordingly, we conclude Haskell's withdrawal did not, as in *Thomas*, extinguish defendant's right to reasonable assistance under the Act.

¶ 74    In reaching this conclusion, we note we have no quarrel with *Thomas*'s holding. Nothing in the Act contemplates the appointment of successive postconviction counsel once a defendant's original appointed counsel is granted leave to withdraw on the basis that the defendant's claims are unmeritorious. But the record in this case clearly shows the circuit

- 13 -

court's basis for allowing Haskell to withdraw was not the underlying merits of defendant's claims.

¶ 75    We find support for our conclusion in *Granville Johnson*, 2018 IL 122227. In *Granville Johnson*, the supreme court held a defendant who retains an attorney at the first stage of proceedings under the Act is entitled to reasonable assistance—though not necessarily to the protections of Rule 651(c) (which are germane to second-stage proceedings)—from his retained attorney. *Id.* ¶ 18. But, as noted, at the first stage, a defendant has no statutory right to appointed counsel; the right to appointed counsel attaches at the second stage. Accordingly, *Granville Johnson* supports the conclusion that a defendant is entitled to reasonable assistance even when he lacks the statutory right to appointed counsel, and we see no reason not to extend that reasoning to the case at bar.

¶ 76    B. Did Defendant's Attorneys Provide Reasonable Assistance?
¶ 77    1. *The Failure to Attempt to Obtain a Properly Notarized Affidavit From Spires to Support Defendant's Actual-Innocence Claim*
¶ 78    Defendant argues his retained attorneys provided unreasonable assistance when they failed to fulfill their duty to make amendments to the *pro se* petition that were necessary to adequately present his actual-innocence claim. Specifically, defendant asserts the record shows his retained attorneys made no effort to obtain a notarized affidavit from Spires to support defendant's actual-innocence claim. Defendant maintains his retained attorneys' failure to obtain a properly notarized affidavit from Spires was fatal to his actual-innocence claim, thus demonstrating they did not provide him reasonable assistance. We agree.

¶ 79    To succeed on a claim of actual innocence, a defendant must present new, material, noncumulative evidence that is of such conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is new when it is discovered after trial and could not have been discovered sooner through the exercise of due diligence. *Id.* Evidence is material when it is relevant and probative of the defendant's innocence. *Id.* Evidence is noncumulative when it adds to what the jury heard. *Id.*

¶ 80    The failure to submit a properly notarized affidavit in support of a postconviction claim is a nonjurisdictional procedural defect. *People v. Allen*, 2015 IL 113135, ¶ 35. When, as here, the defendant submits an unnotarized statement, the State may challenge the defect at the second stage of the proceedings. *Id.* And when "a defendant's postconviction counsel is unable to obtain a properly notarized affidavit, the court may dismiss the petition upon the State's motion." *Id.*

¶ 81    Here, defendant submitted with his *pro se* petition the unnotarized statement of Spires, who was the sole support for his actual-innocence claim. Though the document was styled as an "affidavit," it was not an affidavit, which is a "statement sworn to before a person who has authority under the law to administer oaths." (Internal quotation marks omitted.) *Id.* ¶ 31. For purposes of the Act, a statement that is made under penalty of perjury as set forth in section 1-109 of the Code (735 ILCS 5/1-109 (West 2020)) but is not notarized is not sufficient to survive second-stage dismissal. *People v. Nitz*, 2011 IL App (2d) 100031, ¶¶ 16-17; see also *Allen*, 2015 IL 113135, ¶¶ 34-36 (unnotarized statement, signed by witness under penalty of perjury, was not a true affidavit but nevertheless constituted "other evidence" sufficient to survive summary dismissal); *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 104 (unnotarized

statements were not true affidavits for purposes of the Act and were not sufficient to provide evidentiary support for the defendant's claims at second stage of proceedings; the State correctly challenged the defect at the second stage and the appellate court would not consider them on appeal). Accordingly, defendant's *pro se* actual-innocence claim suffered from a procedural defect that was fatal at the second stage of the proceedings. But the record shows that, even after the State challenged this fatal defect in its motion to dismiss, neither of his retained attorneys attempted to cure it.

¶ 82    Under Rule 651(c), postconviction counsel has an obligation to present a defendant's postconviction claims to the court in appropriate legal form, which at a minimum requires counsel "to attempt to obtain evidentiary support for claims raised in the *pro se* petition." *People v. Waldrop*, 353 Ill. App. 3d 244, 251 (2004). Further, postconviction counsel must at least attempt to overcome procedural defects, if possible. See *People v. Turner*, 187 Ill. 2d 406, 413-15 (1999). Ordinarily, we would presume defendant's retained attorneys made a concerted effort to obtain affidavits in support of his claim but were unable to do so. *People v. Johnson*, 154 Ill. 2d 227, 241 (1993) (*Milton Johnson*). But the record in this case flatly contradicts such a presumption. See *id.*

¶ 83    *Waldrop* is instructive. In that case, we held the defendant's postconviction attorney provided unreasonable assistance. *Waldrop*, 353 Ill. App. 3d at 250. We noted that, while courts will ordinarily presume postconviction counsel made a concerted effort to obtain affidavits in support of a defendant's claims, the record before us flatly contradicted such a conclusion because the attorney "mistakenly believed that he did not have a duty to seek an affidavit from the witness specifically identified in defendant's *pro se* petition." *Id.* (citing *Milton Johnson*, 154 Ill. 2d at 241).

¶ 84    Here, like in *Waldrop*, the record clearly shows Haiduk was operating under the misconception that Spires's signature "under penalty of perjury" was sufficient to advance the petition to the third stage. Indeed, he argued defendant was not required to have the "affidavit" notarized because it was signed under penalty of perjury and whether Spires existed and would testify consistently with his "affidavit" were factual questions to be resolved at a third-stage evidentiary hearing. This was incorrect; the failure to submit a notarized affidavit is fatal to a petition at the second stage. *Allen*, 2015 IL 113135, ¶ 35.

¶ 85    Admittedly, the record shows Haiduk made some effort *to confirm the existence of Spires*, as he apparently searched for Spires for 30 seconds and found a document from the Chicago Police Department that showed a person named Markus Spires, who was about the same age as defendant, Morales, and Garcia, had been arrested and charged in Cook County in 2016 with an unspecified offense. However, the record does not indicate defendant's retained attorneys made any effort, other than the cursory search described above, to locate Spires *and have him execute a proper affidavit*. Indeed, neither attorney ever indicated they tried without success to obtain a proper affidavit from Spires. And we cannot infer otherwise from their statements to the court that "there really [wa]s a lot going on" and they had "done a pretty lengthy investigation." Under these circumstances, we conclude that, notwithstanding Haiduk's Rule 651(c) certificate, defendant's retained attorneys failed to comply with their duty under that rule to present defendant's *pro se* actual-innocence claim in the appropriate form. At a minimum, the attorneys had a duty "to attempt to obtain" a proper affidavit (*Waldrop*, 353 Ill. App. 3d at 251), and the record rebuts the presumption they did so.

¶ 86    In the circuit court, the State took the position that Spires's affidavit was not sufficient to meet the conclusiveness requirement of an actual-innocence claim because the trial evidence showed the shooter was a "light-skinned" Hispanic man while Garcia was described at trial as "dark skinned." (Haskell also asserted this position in his motion to withdraw.) As noted, the State has abandoned this argument on appeal and not raised any other argument regarding the merits of defendant's actual-innocence claim. It has therefore forfeited any such argument. See, *e.g.*, *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 16.

¶ 87    Moreover, in light of defendant's retained attorneys failure to comply with their duty to shape defendant's *pro se* claims into appropriate legal form, any argument regarding the merits of the actual-innocence claim is improper, as defendant is not required to show prejudice under these circumstances. See *People v. Suarez*, 224 Ill. 2d 37, 47-48 (2007). In any event, we note the circuit court dismissed defendant's actual-innocence claim without regard to the State's argument concerning the relative skin complexions of Garcia and defendant and instead relied solely on the lack of a proper affidavit. In other words, defendant's retained attorneys failure to attempt to obtain proper evidentiary support for defendant's actual-innocence claim prevented the circuit court from considering the merits of defendant's claim and directly contributed to its dismissal without an evidentiary hearing. See *Turner*, 187 Ill. 2d at 413. We conclude defendant did not receive reasonable assistance from his retained attorneys, and therefore, we reverse the circuit court's second-stage dismissal of his petition.

¶ 88                                        2. *Remedy*

¶ 89    We must next consider the appropriate remedy. Defendant asks that we remand the case for further second-stage proceedings, "this time with the reasonable assistance of post-conviction counsel to appropriately present [defendant's] contentions." The State offers no argument on the issue of remedy.

¶ 90    It is well settled that, when a reviewing court determines postconviction counsel has failed to comply with Rule 651(c), the appropriate remedy is to remand the cause to the circuit court for further second-stage proceedings, regardless of whether the claims raised in the petition had merit. *Suarez*, 224 Ill. 2d at 47-48 (collecting cases). Reviewing courts should "not speculate whether the [circuit] court would have dismissed the petition without an evidentiary hearing if counsel had adequately performed his [(or her)] duties under Rule 651(c)." *Turner*, 187 Ill. 2d at 416 (citing *Milton Johnson*, 154 Ill. 2d at 246). "It is the duty of the [circuit] court, and not [a] court [of review], to determine on the basis of a complete record whether the post-conviction claims require an evidentiary hearing." *Milton Johnson*, 154 Ill. 2d at 246. Under the facts of this case, we conclude the appropriate remedy is to remand this matter for further second-stage proceedings, at which the circuit court must appoint new counsel who must then comply with Rule 651(c). *Id.* at 249; *Turner*, 187 Ill. 2d at 417; *People v. Addison*, 2021 IL App (2d) 180545, ¶ 35; *Nitz*, 2011 IL App (2d) 100031, ¶ 21. In doing so, we emphasize nothing in this decision should be construed as an opinion on the merits of the claims in defendant's *pro se* petition.

¶ 91                                        III. CONCLUSION

¶ 92    For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand this matter for second-stage postconviction proceedings with new counsel and

compliance with Rule 651(c).

¶ 93          Reversed and remanded.